Filed 8/5/16  P. v. Bath CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041250 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1242901) |
| v. | |
| AMANPREET SINGH BATH, | |
| Defendant and Appellant. | |

## I.  INTRODUCTION

A jury convicted defendant Amanpreet Singh Bath of two counts of rape by an intoxicating substance (Pen. Code, § 261, subd. (a)(3))[1] and one count of kidnapping for rape (§ 209, subd. (b)(1)).  The rape counts involved two victims:  Vanessa Doe and N. Doe.  The count of kidnapping for rape involved N. Doe only.  The trial court imposed the six-year midterm for the Vanessa Doe rape, stayed the term for the N. Doe rape pursuant to section 654, and imposed a consecutive indeterminate life term for the kidnapping for rape.

On appeal, defendant contends:  (1) there was insufficient evidence to support his conviction of the Vanessa Doe rape; (2) the trial court erred by refusing to modify the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

instruction on rape by an intoxicating substance; (3) there was insufficient evidence to support his conviction of kidnapping for rape; and (4) the trial court's instruction on kidnapping for rape was erroneous. For reasons that we will explain, we will affirm the judgment.

## II. BACKGROUND

### A. *Vanessa Doe Incident*

#### 1. Testimony of Vanessa Doe

On the night of December 30, 2011, Vanessa Doe went out with several friends to celebrate the birthday of her friend Elizabeth. Before going out, Vanessa drank a "vodka shooter." She had also smoked marijuana earlier that evening. The group went to a bar in downtown San Jose.

At the bar, Vanessa drank two shots of whiskey within about 10 minutes. She may also have consumed some beer. Vanessa, who had a boyfriend at the time, did not flirt with anyone at the bar. After a while, the effects of the alcohol made her unable to walk straight, and she felt sick. She told her friends she wanted to go home.

The next thing Vanessa remembered was waking up naked in defendant's bed the next morning. She had not seen defendant in the bar the night before. She asked defendant who he was. Defendant responded, "I'm the cab driver. Remember me?" Vanessa still did not remember having been in a taxi cab.

Defendant explained that a bouncer had called him and that bouncers had carried Vanessa out of the bar, put her into his taxi cab, and told him to take her to 12th and Reed. Defendant said that he had driven to that location, but that Vanessa had not been able to identify her house. Vanessa had been sleeping in the backseat of the taxi cab, but defendant had woken her up and had tried to help her find her car by "hitting the alarm" on her car keys. Defendant told Vanessa that they had gone to a Carl's Jr. restaurant and

2

that they had eaten food at his house.  Defendant said they had gone to his house because he was tired and wanted to go to sleep.

Defendant told Vanessa that after eating, she had been able to walk and talk coherently.  Defendant knew the names of two of her friends.  He assured her that no one had seen her in his home.  When Vanessa asked how she had ended up in defendant's bedroom, defendant told her he had showed her to the bathroom.  Defendant initially told Vanessa that she had taken off her skirt and "jumped into bed over him."  He then said that she had gotten into bed, wet the bed, and taken her clothes off.

Vanessa put her clothes back on and asked whether "anything physical had happened" between them.  Defendant said, "No.  You were on your period."  Defendant referenced a "pad."  Although Vanessa was not menstruating, she had worn a panty liner the night before because she was "expecting it."  Vanessa asked defendant to take her home, and he did, giving her a business card.  Upon dropping her off, defendant did not ask for payment.

At home, Vanessa showered and then took a nap.  She had anal discomfort and thought that her vagina might have been penetrated.  Vanessa later went to a hospital, where a Sexual Assult Response Team (SART) examination was conducted.  She was interviewed by a sexual assault detective a few days later.  She told the detective that she had previously suffered a "blackout," during which she had not remembered her interactions.

Pursuant to instructions from the detective, Vanessa made a pretext call to the phone number on defendant's business card.  When defendant answered, she identified herself as "Vanessa from Friday night."  Vanessa told defendant she did not remember what had happened and wanted to ask him again.  Defendant indicated that he could not talk at that time but that Vanessa could call him back in 15 minutes.

Vanessa called defendant again.  She asked defendant to tell her what had happened when they got back to his house.  Defendant said that he had gone upstairs to

3

sleep while Vanessa was eating, and that Vanessa had later come upstairs. After noticing that she might have "peed" in her pants, defendant had offered her some clothes. Defendant said Vanessa then took her clothes off and got under the covers. Defendant had gotten into bed, but they had not kissed or done anything else.

Vanessa told defendant she felt sore. She noted that defendant had told her that she had passed out in his back seat and said, "I must have been pretty drunk." Defendant agreed that Vanessa had passed out "initially" but asserted that two hours later, she was not drunk. Vanessa continued to ask why defendant had taken her to his house. Defendant explained that when they had been near her house, she had not been "conscious." He had not thought to take her to a hospital or a police station because after she ate, she seemed "fine." He claimed that Vanessa had been able to walk into his house on her own and that he did not know how a drunk person behaves because he had never been drunk himself. However, defendant acknowledged that earlier in the evening, he had been able to tell that Vanessa was not in "any kind of condition" to get food.

When Vanessa indicated she was going to get an examination, defendant reiterated that he had not touched her "at all" and that "[n]othing happened."

### 2. Testimony of Vanessa Doe's Friends

Vanessa's friend Enrique went out to the bar with Vanessa. He bought Vanessa a shot and watched as she "downed it." Vanessa did not seem sober at that time, which was about 1:00 a.m. Enrique could tell Vanessa was drunk because she was verbally flirtatious with him.

Elizabeth was also out with Vanessa the night of the incident. She shared a drink with Vanessa, and they both had tequila shots. Elizabeth felt intoxicated: an eight on a scale of one to 10. Vanessa looked like she needed help walking, and she appeared to be sleepy. Vanessa was unable to sit up straight. Elizabeth did not see Vanessa flirt with anyone at the bar.

4

### 3. Investigation

The SART examination revealed discharge and a hair or fiber in Vanessa's vagina, indicating a sexual assault or consensual sexual encounter. Vaginal swabs and DNA testing revealed the presence of defendant's semen.

### B. *N. Doe Incident*

### 1. Testimony of N. Doe

On the night of January 20, 2012 (about three weeks after the incident involving Vanessa Doe), N. Doe was at the home of her friend Scott. Two of N.'s female friends were there as well: Jennifer and Truc. At the time, N. was in an exclusive relationship with her boyfriend, who was living in another state.

While at Scott's house, N. had four "half shots" of Crown Royal, which she "chased" with a soda. She and her friends then went to a nightclub in downtown San Jose, arriving at about 11:30 p.m. While at the nightclub, N. consumed more alcohol: two cocktails and then two shots of Grey Goose. After drinking the additional alcohol, N. could still walk and talk, but she did not remember leaving the bar or getting into a car.

The next thing N. remembered was waking up in the back of a taxi cab. She felt someone behind her, and she felt a penis penetrating her vagina. She then fell back asleep. When she woke up again, she still felt the penis in her vagina, and she felt her leggings being pulled down further. She did not try to resist or say stop. She either fell back asleep or vomited.

N. next remembered sitting up and feeling confused. She saw defendant—a man she had never seen before—standing outside of the taxi cab, doing something with the button of his pants or his belt buckle. N. told defendant to take her home and gave him Scott's address.

While defendant drove, N. was still confused about how she came to leave her friends and go with defendant. Upon arriving at Scott's house, N. ran inside. Her friends

were still awake. She did not talk to them about what had happened, because she was ashamed and confused. She went to the bathroom and vomited again. She was still feeling drunk. N. next called her boyfriend, washed herself off, and fell asleep in a bed.

Later that day, N. called the police. N. met a police officer in a parking lot and told him what had happened. She then went to Santa Clara Valley Medical Center, where she underwent a SART examination. The next morning, N. told Scott what had happened. Scott told her about finding a strange jacket in his room.

About seven months later, on August 31, 2012, N. went out drinking with friends again. Afterwards, she drove a car, not wanting to take a taxi cab. She was pulled over by the police and arrested for drunk driving. She later filed a civil lawsuit against defendant.

### 2. Testimony of N. Doe's Friends

Scott testified that the group had stayed together at the nightclub. N. had not been "hanging on" or kissing anyone. The group decided to leave at around 1:15 a.m. Scott helped N. walk: she was "slumped down" and used him as a crutch. Scott could tell that N. was so drunk she might throw up.

Scott saw defendant's taxi cab across the street. He helped N. get inside the taxi cab, then looked around for Jennifer and Truc, who were still on the other side of the street. Scott told defendant to "not start the meter" and went to get Jennifer and Truc. He grabbed them and returned to where the taxi cab had been parked, but it was gone. He waited for a short time and then took another taxi cab back to his house. N. arrived at Scott's house about an hour and a half later, wearing a jacket that Scott did not recognize. Truc testified that she could tell N. was drunk when they left the nightclub, because N. needed help walking.

6

### 3. Investigation

The SART examination revealed that N. had small bruises on her thigh, buttock, and ear. N. also had bruising on her cervix, although that could have resulted from consensual sex. Vaginal swabs revealed the presence of defendant's sperm.

## C. *Defense Case*

### 1. Defendant's Testimony About the Vanessa Doe Incident

On December 30, 2011, defendant was driving his taxi cab. He was flagged down by Vanessa and "two others." Vanessa got into the taxi cab, and someone else told defendant, "I think she's going to 12th and Reed." Defendant then confirmed that location was where Vanessa wanted to go.

As defendant began driving, Vanessa started talking to him about "problems in the Middle East." She moved closer to him and asked to get a bottle of vodka at a liquor store, but she then changed her mind and said she wanted to get something to eat. She asked defendant to take her to a taqueria. Defendant drove to the taqueria, but there was a long line, so Vanessa said, "Forget it."

Defendant then drove to the area of 12th and Reed. When he arrived in that area, he asked Vanessa, "Hey, where is your place?" Vanessa did not respond, so defendant asked again, with a raised voice. Vanessa was dozing off and did not respond again. Defendant asked a third time, even more loudly. Vanessa then handed defendant her keys without saying anything. Defendant tried to find her car by pushing the remote alarm button on her keys while driving around the area, but he was unsuccessful. Defendant told Vanessa he could not find her house and complained that he was getting tired. Vanessa woke up when defendant raised his voice. She asked, "Hey, where is Liz? Where is Liz and them?" Vanessa started to doze off again, but after defendant again addressed her with a raised voice, asking where she lived, she gave him her driver's license. Defendant asked Vanessa if she wanted to go to the address on her driver's license. Vanessa said no and indicated "she had some problem going there." Defendant

7

asked where Vanessa wanted to go, but Vanessa did not respond. Defendant then offered to take her to his house. Vanessa said that was okay.

As they drove, defendant asked Vanessa why she did not want to go to the address on her driver's license. Vanessa explained it was her parent's house and that she did not want to bother them. Defendant also asked Vanessa about where she grew up, and she responded. Vanessa then told defendant she was hungry. Defendant took her to a Carl's Jr. restaurant, where Vanessa ordered food at the drive-through window.

After leaving Carl's Jr., defendant and Vanessa conversed about why she did not have a cell phone with her. When they arrived at defendant's house, Vanessa walked from the taxi cab to the house without any problem. When defendant took his shoes off at the front door, Vanessa took her shoes off. Inside the house, Vanessa put her food down on the kitchen counter and used the downstairs bathroom. Defendant talked to Vanessa about how he had tried to find her house and her car. Vanessa commented on the view from defendant's kitchen.

Defendant's sister entered while Vanessa was sitting at the kitchen counter, eating her food. After his sister left, defendant told Vanessa to make herself at home and that there were blankets on the sofa. Defendant then went upstairs to his bedroom. Defendant was married at the time, but his wife was not home.

After defendant got into bed, he heard Vanessa come upstairs and ask where he was. She got on top of defendant, and he got aroused and excited. Vanessa told defendant he was really sweet and had really nice eyes. Vanessa tried to kiss defendant on the mouth, but he turned away, so she kissed his neck instead. Defendant then began kissing her back and touching her legs. Defendant put his hand up her shirt, unbuttoned her bra, and kissed her breasts. Vanessa took off her clothes first, and then defendant took his clothes off. They had intercourse, and then defendant went to the restroom to clean himself up. When he returned, he offered Vanessa some sweats to wear. Vanessa

8

called him back in to bed and asked if he had any marijuana. Defendant said he did not, and then they both went to sleep.

The next morning, Vanessa woke up and asked who he was and where she was. Defendant was surprised that she did not remember. He took her home and gave her his business card.

Defendant explained why, during Vanessa's pretext call, he had lied and told her they did not have sex. He believed he was being recorded and was worried because he was married with a family.

### 2. Testimony of Defendant's Sister

Varinderpal Bath,[2] defendant's sister, lived in the same house as defendant, along with a number of other family members. Defendant and his sister lived on different sides of the house.

On the night of the Vanessa Doe incident, Varinderpal heard dogs barking and went to defendant's side of the house. Varinderpal heard defendant talking to someone. She entered the kitchen, where she saw Vanessa sitting on a bar stool, eating something. Varinderpal said "hello," and Vanessa waved to her. Defendant told Varinderpal that he had been giving Vanessa a ride, but that she would not or could not provide her address, and he had become tired, so he had brought her home. Varinderpal heard defendant tell Vanessa he was tired and was going to bed, that Vanessa should make herself at home, and that there was a blanket on the sofa. Varinderpal asked defendant where his wife was, and defendant said she was visiting her parents.

### 3. Defendant's Testimony About the N. Doe Incident

On January 20, 2012, defendant was driving his taxi cab and was flagged down by N. and Scott. They walked over and got into his taxi cab. Scott told N., "Scoot over,

---

[2] Since defendant and Varinderpal Bath have the same surname, we will refer to Varinderpal by her first name for purposes of clarity and not out of disrespect.

9

bitch," then told defendant he had to get his other friends. Scott got out of the car and told N., "You better not throw up, bitch." He told defendant, "And you better not fucking start the meter."

Defendant waited for about five minutes or more, but another car started honking at him, which drew the attention of nearby police officers. An officer approached and indicated defendant should move his car. Defendant told the officer he was waiting for the rest of N.'s party, but the officer said he could not stay in that spot. Defendant drove off, intending to come back to the area, but after driving for one and a half blocks, N. vomited. N. had previously been holding her stomach, and defendant had instructed her to let him know if she wanted him to pull over.

After N. vomited, defendant pulled over. When she said that it was okay to go, he drove back to the bar, but her friends were not there. Defendant asked N. if she wanted him to look for her friends, and she said yes. They drove around to various places, including some restaurants, but did not find N.'s friends. Defendant then asked N. what she wanted to do, and N. replied, "Take me home." However, N. then said, "No, no. Take me to my friend's home." She instructed defendant where to drive.

While driving, N. indicated she was cold, so defendant gave her his jacket. Defendant asked N. why Scott kept calling her "bitch." N. told defendant, "That's normal. That's how we talk." Defendant asked N. about paying him the fare, and she told him, "Don't worry. I will take care of it."

N. then asked defendant to "come back and be close to her," so defendant pulled into a convenience store parking lot. Defendant thought N. wanted to give him oral sex. He told her he wasn't ready, but N. said, "Don't worry. I'll get you ready." Defendant got into the back seat and sat next to N., who began touching him. Defendant began to get aroused. He pulled his pants down, and N. rubbed his penis. N. then took her clothes off, turned onto her side and told defendant to "cum inside her." Defendant put his penis into her vagina but stopped because it felt like "a mess." N. seemed disappointed.

10

Defendant got out of the taxi cab and was fixing his pants when N. told him to take her home. He drove her to Scott's house. N. got out of the taxi cab and went into the house without paying him.

### 4. Testimony of Officer Thomas

California Highway Patrol Officer Eric Thomas testified about the incident in which N. was arrested for drunk driving. When he pulled N. over, she exhibited signs of alcohol intoxication but told him she had only consumed one beer. A breath test revealed her blood alcohol content was 0.22 percent.

### D. *Charges, Verdicts, Motion for a New Trial, and Sentencing*

Defendant was charged with committing rape by an intoxicating substance (§ 261, subd. (a)(3)) of both N. Doe (count 1) and Vanessa Doe (count 4). As to N. Doe, defendant was also charged with kidnapping for rape (§ 209, subd. (b)(1); count 2) and kidnapping (§ 207, subd. (a); count 3). The jury was informed that the kidnapping charge in count 3 was a lesser included offense of kidnapping for rape.

After the jury's verdicts, defendant moved for a new trial, arguing that the verdicts were not supported by the evidence and that the trial court committed prejudicial error by failing to grant his request for a modification to the instruction on rape by an intoxicating substance. The trial court denied defendant's motion for a new trial.

The trial court imposed the six-year midterm for the Vanessa Doe rape, stayed the term for the N. Doe rape pursuant to section 654, and imposed a consecutive indeterminate life term for the kidnapping for rape.

## III. DISCUSSION

### A. *Sufficiency of the Evidence – Vanessa Doe*

Defendant contends there was insufficient evidence to support his conviction of rape by an intoxicating substance (§ 261, subd. (a)(3)) of Vanessa Doe (count 4). Defendant argues there was no substantial evidence to support the jury's findings that

11

alcohol intoxication prevented Vanessa Doe from resisting sexual intercourse and that defendant knew or reasonably should have known of that condition.

### 1. Standard of Review

"The law we apply in assessing a claim of sufficiency of the evidence is well established: ' " ' "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' [Citation.] The standard is the same under the state and federal due process clauses. [Citation.] 'We presume " 'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved." [Citation.]' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294 (*Gonzales and Soliz*).)

### 2. Analysis

Under section 261, subdivision (a)(3), "[r]ape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, . . . [¶] . . . [¶] [w]here a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused."

"[S]ection 261(a)(3) proscribes sexual intercourse with a person who is not capable of giving legal consent because of intoxication." (*People v. Giardino* (2000) 82 Cal.App.4th 454, 462 (*Giardino*).) In a prosecution under this statute, "the issue is not whether the victim actually consented to sexual intercourse, but whether he or she was capable of exercising the degree of judgment a person must have in order to give legally cognizable consent." (*Ibid.*) The statute does not "require the victims to be so intoxicated that they are physically incapable of either speaking or otherwise manifesting a refusal to give actual consent. Instead, . . . the statute requires only that the level of

12

intoxication be such that the victim is incapable of exercising the judgment required to decide whether to consent to intercourse." (*Id.* at p. 464.) In addition, the statute provides that "the accused is guilty only if the victim's incapacitating level of intoxication 'was known, or reasonably should have been known by the accused.' " (*Id.* at p. 472.)

Defendant acknowledges there was evidence that Vanessa was actually intoxicated "when she left the nightclub," but he contends the prosecution did not prove that Vanessa was still intoxicated "at the time of the intercourse" with defendant. Defendant asserts that Vanessa was "walking and talking under her own control" when she was with defendant. Defendant points out that he knew the names of Vanessa's friends, and he relies on his own testimony about how Vanessa had been able to remove her shoes by herself, how she had climbed the stairs of his residence by herself, and how she had gotten into his bed voluntarily. Further, defendant notes that a person's blood alcohol level dissipates over time. (See *Missouri v. McNeely* (2013) __ U.S. __ [133 S.Ct. 1552, 1560].)

Viewed in the light most favorable to the judgment (*Gonzales and Soliz, supra,* 52 Cal.4th at p. 294), the evidence established that Vanessa consumed a significant amount of alcohol before leaving the bar, and that she was so intoxicated that she could not walk straight or sit up straight. Elizabeth testified that Vanessa did not seem sober when she left the bar at about 1:00 a.m. Even defendant's testimony showed that after leaving the bar, Vanessa was so drunk that she passed out in the back of his taxi cab. Defendant also testified that during the drive, Vanessa exhibited confusion about where her friends were. She was so drunk she could not verbally respond when defendant asked for her address. When she was at defendant's house, Vanessa urinated in the bed or in her clothing, showing she was still very intoxicated at that time. The jurors considering this evidence could reasonably conclude that Vanessa was so intoxicated that she was "not capable of exercising the degree of judgment a person must have in order to give

13

legally cognizable consent." (*Giardino, supra,* 82 Cal.App.4th at p. 462.)  The jury could reasonably reject defendant's self-serving testimony about what happened at his house, particularly since he had made contradictory statements to Vanessa, including his initial claims about not having had sexual intercourse with her.

We next consider defendant's claim that there was no substantial evidence he knew or reasonably should have known that Vanessa was so intoxicated that she was incapable of consenting to sexual intercourse.  Defendant cites the following evidence as supporting a finding that he did not know and would not reasonably have known that Vanessa was incapable of consenting:  the fact she stayed in bed to talk with defendant the next morning, and the fact that defendant gave her his business card the next day.

Again, we must view the evidence in the light most favorable to the judgment. (*Gonzales and Soliz, supra,* 52 Cal.4th at p. 294.)  Defendant told Vanessa that bouncers had to carry her out to his taxi cab, and he testified that she had passed out in the back of his taxi cab and did not verbally respond when he asked where she lived.  There was also evidence that Vanessa had urinated on herself when she was at defendant's house.  A reasonable juror could conclude that a person in defendant's position, who was aware of these facts, should have known that at the time of the sexual intercourse, Vanessa was so intoxicated that she was incapable of consenting.

In sum, substantial evidence supports defendant's conviction of rape by an intoxicating substance (§ 261, subd. (a)(3)) of Vanessa Doe (count 4).

### B.      *Refusal to Define "Prevented From Resisting"*

Defendant contends the trial court erred by refusing to modify CALCRIM No. 1002, the instruction on rape by an intoxicating substance (§ 261, subd. (a)(3)) to include certain language from *Giardino, supra,* 82 Cal.App.4th 454.

#### 1.      **Proceedings Below**

After an informal discussion, the parties stated their positions about certain jury instructions on the record.  Regarding CALCRIM No. 1002, defendant discussed the

14

definition of "prevented from resisting" given in *Giardino*. Defendant further discussed the *Giardino* court's discussion of the phrase "impaired mentality." The trial court indicated that if the jury had a question about the instruction, the court would "expand on it" at that time, but it would not modify the instruction ahead of time.

The jury was instructed pursuant to CALCRIM No. 1002 as follows: "The defendant is charged in Counts 1 and 4 with raping a woman while she was intoxicated, in violation of Penal Code §261[, subdivision] (a)(3). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] One, the defendant had sexual intercourse with a woman; [¶] two, he and the woman were not married to each other at the time of the intercourse; [¶] three, the effect of an intoxicating substance prevented the woman from resisting; [¶]] and four, the defendant knew or reasonably should have known that the effect of [an] intoxicating substance prevent[ed] the woman from resisting. [¶] Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis. Ejaculation is not required. [¶] A person is prevented from resisting if he or she is so intoxicated that he or she could not give legal consent. In order to give legal consent, a person must be able to exercise reasonable judgment. In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences. Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved. [¶] The defendant is not guilty of this crime if he actually and reasonably believed that the woman was capable of consenting to sexual intercourse, even if that belief was wrong. The People have the burden of proving beyond a reasonable doubt that defendant did not actually and reasonably believe that the woman was capable of consenting. If the People have not met this burden, you must find the defendant not guilty."

In his motion for a new trial, defendant argued that the trial court had erred by failing to include additional language from *Giardino* in CALCRIM No. 1002. The prosecutor pointed out that the instruction already included some of the requested

15

language and that the jury had not asked for any clarification of that instruction. The trial court denied defendant's motion for a new trial.

### 2. Analysis

In *Giardino,* the jury was instructed on rape by an intoxicating substance pursuant to CALJIC No. 10.02. (*Giardino, supra,* 82 Cal.App.4th at p. 464.) The instruction informed the jury that one of the elements of the offense was that " '[t]he alleged victim was prevented from resisting the act by an intoxicating substance . . . .' " (*Ibid.*) During deliberations, the jury asked the court for the legal definition of "resistance." (*Ibid.*) In response, the trial court told the jury " 'to determine the everyday meaning of resistance.' " (*Id.* at p. 467.)

The *Giardino* court held that the trial court should have provided a definition of the phrase " 'prevented from resisting.' " (*Giardino, supra,* 82 Cal.App.4th at p. 466.) The court found the jury's difficulty in "grasping the import of the statutory language" was understandable, since "the statutory language suggests that the factual issue is whether the intoxicating substance prevented the victim from physically resisting," but "the correct interpretation focuses on whether the victim's level of intoxication prevented him or her from exercising judgment." (*Ibid.*) The trial court should have instructed the jury "that its task was to determine whether, as a result of her level of intoxication, the victim lacked the legal capacity to give 'consent' as that term is defined in section 261.6." (*Ibid.*) The *Giardino* court explained, "Legal capacity is the ability to exercise reasonable judgment, i.e., to understand and weigh not only the physical nature of the act, but also its moral character and probable consequences. [Citations.]" (*Ibid.*)

The *Giardino* court further noted that "[i]n deciding whether the level of the victim's intoxication deprived the victim of legal capacity," a jury should consider "all the circumstances, including the victim's age and maturity. [Citation.]" (*Giardino, supra,* 82 Cal.App.4th at p. 466.) The court specified that a person can be "intoxicated to some degree" and yet still "able to exercise reasonable judgment." (*Ibid.*) For purposes

16

of section 261, subdivision (a)(3), "the level of intoxication and the resulting mental impairment must have been so great that the victim could no longer exercise reasonable judgment." (*Giardino, supra,* at pp. 466-467.)

In the instant case, the jury was instructed pursuant to CALCRIM No. 1002, which—unlike the instruction given in *Giardino*—included a definition of "prevented from resisting." The jury was instructed: "A person is prevented from resisting if he or she is so intoxicated that he or she could not give legal consent. In order to give legal consent, a person must be able to exercise reasonable judgment. In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences. Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved."

Defendant contends that additional language from *Giardino* should have been included—specifically, *Giardino's* direction that "[i]n deciding whether the level of the victim's intoxication deprived the victim of legal capacity," a jury should consider "all the circumstances, including the victim's age and maturity" and its observation that a person can be "intoxicated to some degree" and yet still "able to exercise reasonable judgment." (*Giardino, supra,* 82 Cal.App.4th at p. 466.) Defendant contends these concepts pinpointed his theory of the defense: that Vanessa may have been intoxicated, but not to such a degree that she was unable to exercise reasonable judgment.

A defendant "has a right to an instruction that pinpoints the theory of the defense." (*People v. Mincey* (1992) 2 Cal.4th 408, 437, italics omitted.) The trial court may, however, "properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation]." (*People v. Moon* (2005) 37 Cal.4th 1, 30.) We apply the de novo standard of review when determining whether the trial court erred in refusing to give a requested pinpoint instruction. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.)

17

The additional language from *Giardino* would have been duplicative of language in CALCRIM No. 1002, which told the jury that Vanessa was "prevented from resisting" within the meaning of section 261, subdivision (a)(3) if she was "so intoxicated" that she could not give "legal consent," meaning she was not "able to exercise reasonable judgment," and not "able to understand and weigh the physical nature of the act, its moral character, and probable consequences." As another court has held, "CALCRIM No. 1002 correctly incorporates the law of rape of an intoxicated woman as set forth in *People v. Giardino, supra,* 82 Cal.App.4th at page 454." (See *People v. Smith* (2010) 191 Cal.App.4th 199, 205.) Thus, we conclude the trial court here did not err by failing to modify the instruction.

### C.      Sufficiency of the Evidence – N. Doe

Defendant contends there was insufficient evidence to support the jury's finding that N. Doe was kidnapped for rape in violation of section 209, subdivision (b)(1) (count 2).

Defendant first argues that there was no substantial evidence that N. did not consent to the initial movement of the taxi cab. He first discusses section 6.64.290.A of the San Jose Municipal Code, which provides: "No owner or driver of any taxicab shall refuse to provide taxicab service to a person who requests to be taken to a destination within the City of San José, except as provided in Section 6.64.290.B of this chapter." Defendant contends that this ordinance means that a person who enters a taxi cab necessarily "consents to be transported by that cab."

Defendant's argument fails for at least two reasons. First, there was no evidence that N. ever requested defendant take her to any destination. Scott was the only person who gave defendant instructions, and the instruction was to wait. Even defendant testified he drove the cab away without N. having requested he take her anywhere. Second, the ordinance provides an exception to a taxi cab driver's duty; it provides: "The owner or driver may refuse to provide taxicab service when . . . [¶] [t]he person

18

requesting such service does not appear to be in a sober or orderly manner." (San Jose Muni. Code, § 6.64.290.B.1.) The evidence here established that N. did not appear to be sober at the time she entered defendant's cab: N.'s friends testified that she needed help walking to the taxi cab, and defendant testified that after N. got into the taxi cab, Scott warned her not to throw up.

Next, defendant contends there was no substantial evidence to support a finding that he did not reasonably believe N. consented to the initial movement. This argument also fails. A reasonable person in defendant's position, who was instructed to wait by Scott and who heard Scott warn N. not to throw up, would not believe that N. had consented to him driving her anywhere. Even after an officer indicated defendant needed to move his vehicle, a reasonable person would not believe that N. consented to being driven away.

Finally, defendant contends there was no substantial evidence to support a finding that he had the specific intent to rape N. at the time of the initial movement. He contends the evidence failed to show that defendant formed the intent to rape at the time of the initial movement as opposed to a later point during the drive. We disagree. The jury could reasonably infer that defendant intended to rape N. when he drove away after Scott explicitly instructed him not to start the meter. The jury was not required to accept defendant's explanation for his initial movement and could determine, based on the circumstantial evidence, that defendant saw an opportunity to rape N. and therefore drove away with her in his vehicle. (See *Gonzales and Soliz, supra,* 52 Cal.4th at p. 294.)

We conclude substantial evidence supports defendant's conviction of count 2, kidnapping for rape.

### D. *Kidnapping for Rape Instruction*

Defendant contends that the instruction on kidnapping for rape was flawed because it used the term "mental impairment" without telling the jury that N. Doe had such a "mental impairment" only if she was so intoxicated that she could not exercise

19

reasonable judgment. Defendant also contends the trial court erred by failing to instruct the jury that it would be a defense to the kidnapping for rape charge if defendant actually but unreasonably believed that N. Doe would consent to sexual intercourse.

### 1. Proceedings Below

The trial court instructed the jury on kidnapping for rape pursuant to CALCRIM No. 1203 as follows:

"The defendant is charged in Count 2 with kidnapping for the purpose of rape, in violation of Penal Code §209[, subdivision] (b)(1). To prove that the defendant is guilty of this crime, the People must prove that . . . : [¶] One, the defendant intended to commit rape; [¶] two, acting with that intent, the defendant used physical force or deception to take and carry away an unresisting person with a mental impairment; [¶] three, acting with that intent, the defendant moved the person with a mental impairment a substantial distance; [¶] four, the person was moved or made to move a distance beyond that merely incidental to the commission of a rape; [¶] five, when the movement began, the defendant already intend[ed] to commit rape; [¶] six, the person suffered from a mental impairment that made her incapable of giving legal consent to the movement; [¶] and seven, the defendant did not actually and reasonably believe that the other person consented to the movement. [¶] As used here, substantial distance means more than a slight or trivial distance. The movement must have substantially increased the risk of physical or psychological harm to the person beyond that necessarily present in a rape. In deciding whether the movement was sufficient, consider all the circumstances relating to the movement. [¶] In order to consent, a person must act freely and voluntarily and know the nature of the act. [¶] A person with a mental impairment may include unconscious or intoxicated adults incapable of giving legal consent. [¶] A person is incapable of giving legal consent if she's unable to understand the act, its nature, and possible consequences. [¶] Deception includes tricking the mentally impaired person into accompanying him a substantial distance for an illegal purpose. [¶] As defined here,

20

the amount of physical force necessary is the amount of physical force required to take and carry away an unresisting person with a mental impairment a substantial distance. [¶] To be guilty of kidnapping for the purpose of rape, the defendant does not actually have to commit the rape. [¶] To decide whether the defendant intended to commit rape, please refer to the separate instructions that I have given you on that crime. [¶] The defendant is not guilty of kidnapping if he reasonably and actually believed that the other person consented to the movement. The People have the burden of proving beyond a reasonable doubt that the defendant did not reasonably and actually believe that the other person consented to the movement. If the People have not met this burden, you must find the defendant not guilty of this crime."

### 2. Analysis

Defendant first argues that the above instruction was flawed because it misled the jury into believing that alcohol intoxication is a "mental impairment" that renders a person incapable of giving legal consent. He contends the trial court should have included the *Giardino* court's observation that a "mental impairment" stemming from intoxication "must have been so great that the victim could no longer exercise reasonable judgment." (*Giardino, supra,* 82 Cal.App.4th at pp. 466-467.)

Defendant did not request that the kidnapping for rape instruction be modified to include any of the *Giardino* language. Thus, defendant forfeited this claim. (See *People v. Lee* (2011) 51 Cal.4th 620, 638 (*Lee*).) But even if we were to consider the claim based upon defendant's assertion that the instruction affected his substantial rights (see § 1259), we would find it lacks merit.

" 'In reviewing [a] purportedly erroneous instruction[ ], "we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." [Citation.]' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028 (*Richardson*).) In making that determination, " 'we must assume that

21

jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" (*Ibid.*)

As given, the instruction on kidnapping for rape did not permit the jury to find that a N. suffered from a "mental impairment" merely because she was intoxicated. The instruction permitted the jury to find that N. suffered from a "mental impairment" only if she was an "unconscious or intoxicated adult[] incapable of giving legal consent," and the instruction specified that in order to convict defendant of kidnapping for rape, the jury had to find that N. "suffered from a mental impairment that made her incapable of giving legal consent to the movement." The jury was also told that a person is "incapable of giving legal consent if she's unable to understand the act, its nature, and possible consequences." Thus, the instruction provided that defendant could not be convicted of kidnapping for rape unless the jury found that N. was *so* intoxicated that she could not understand the nature and consequences of the movement. There is no reasonable likelihood that the jury misapplied the challenged instruction. (*Richardson, supra,* 43 Cal.4th at p. 1028.)

Defendant next argues the instruction on kidnapping for rape was flawed because it told the jury that only a reasonable, good faith belief in N.'s consent would be a defense. He contends the instruction should have informed the jury that defendant could not be convicted of that offense if he had an *un*reasonable but good faith belief that N. "would consent to sexual intercourse." Defendant contends that because kidnapping for rape is a specific intent crime, he could not be convicted of that crime if he had an unreasonable but good faith belief that N. would consent to intercourse.

The kidnapping for rape instruction told the jury that defendant was not guilty if he "reasonably and actually believed that [N.] consented *to the movement*." (Italics added.) The instruction did not contain any language concerning defendant's belief in N.'s consent to intercourse. To the extent defendant claims the trial court should have added such language to the instruction, the claim is forfeited because defendant did not

22

make any such request in the trial court.  (See *Lee, supra,* 51 Cal.4th at p. 638.)

Moreover, defendant cites no case holding that a defendant may not be convicted of kidnapping to commit rape if he has an unreasonable but good faith belief that the victim will consent to intercourse.  Although kidnapping to commit rape is a specific intent crime (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1151, fn. 6), that does not change the nature of the target offense, rape, into a specific intent crime.

In any event, even assuming the trial court was required to instruct the jury that defendant was not guilty of kidnapping for rape if he moved N. from the bar with the actual but unreasonable belief that she would consent to have sex with him, we would find the error harmless under any standard.  Defendant's own testimony did not provide a basis for the jury to find that, at the time he began transporting N., he believed that she wanted to have intercourse with him.  Defendant testified that he began transporting N. only because a police officer indicated he needed to move his vehicle, that he continued to drive N. around in an attempt to find her friends, and that only later did he believe she wanted to have sex with him.  This testimony did not provide a basis for the jury to find that defendant actually believed, at the time of the initial movement, that N. would consent to sexual intercourse.

In sum, we conclude there was no prejudicial error as to the instruction on kidnapping for rape.

## IV.    DISPOSITION

The judgment is affirmed.

23

_____
BAMATTRE-MANOUKIAN, J.


WE CONCUR:



_____
ELIA, ACTING P.J.




_____
MIHARA, J.